UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-cv- 62187-WPD

**TONY SYFFRAD**, as Personal Representative
of the Estate of **BARRY GEDEUS**,

      Plaintiff,

vs.

**CITY OF FORT LAURDEDALE**, and
**ROBERT MORRIS**, in his individual capacity,

      Defendants.

_____/

## THIRD AMENDED COMPLAINT

**COMES NOW**, Plaintiff **TONY SYFFRAD**, as Personal Representative of the Estate of

**BARRY GEDEUS**, deceased, ("Mr. Gedeus" or "Plaintiff") by and through undersigned counsel,

and hereby files this Third Amended Complaint against the above-named Defendants, **CITY OF**

**FORT LAUDERDALE** ("City" or "Fort Lauderdale") and Officer **ROBERT MORRIS**

("Defendant" or "Morris") (collectively "Defendants"), in his individual capacity, for causing the

death of **BARRY GEDEUS** on March 8, 2020, for which Plaintiff now seeks damages, and in

support thereof alleges as follows:

## INTRODUCTION

This civil action arises from an incident that occurred on or about March 8, 2020, when

Mr. Gedeus was viciously murdered during the course of an alleged foot pursuit. Defendant,

Officer Robert Morris, an employee of the Fort Lauderdale Police Department ("FLPD"), used

unreasonable deadly force in his pursuit of Mr. Gedeus. Mr. Gedeus now brings federal

constitutional claims and state tort claims for the deprivation of his protected rights by the Defendant, operating under the color of state law.

## PARTIES

1.      Plaintiff, Tony Syffrad, is the duly appointed Personal Representative of the Estate of Barry Gedeus, having been appointed Personal Representative by the Probate Division of the Circuit Court in and for Broward County, Florida, File No.: PRC 20-2131. This action is brought by Tony Syffrad, the uncle of Barry Gedeus, in his capacity as Personal Representative of the Estate of Barry Gedeus and on behalf of his survivors.

2.      Defendant, FORT LAUDERDALE, is a municipal subdivision of the State of Florida and is the legal entity responsible for itself.  This Defendant is also the employer of several other named Defendants and is the proper entity to be sued under 42 U.S.C. § 1983.

3.      Defendant, FORT LAUDERDALE, both exercised and delegated its municipal final decision-making power to the Director of FLPD and others.

4.      Defendant, FORT LAUDERDALE, is properly sued directly under 42 U.S.C. §1983 for its own and its delegated, deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification, acquiescence and intentional failures which were moving forces in the complaint of constitutional and statutory violations and resulting injuries.

5.      Defendant, FORT LAUDERDALE, is also properly sued under 42 U.S.C. § 1983 for the challenged delegated final decisions of any final delegated decision-makers, with respect to the hereinafter challenged deliberately indifferent policies, decisions, widespread habits, customs, usages and practices.

6.     Defendant, MORRIS, is, at all times material, a citizen of the United States, a resident of Broward County, Florida, an employee of FLPD, and is *sui juris*.

7.     Defendant was at all times material hereto, a "state actor" as defined in 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

8.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

9.     Additionally, this Honorable Court has supplemental jurisdiction of the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions which give rise to this action occurred with this District.

11.     All conditions precedent, including, but not limited to, compliance with Florida Statutes § 768.28, have occurred, been satisfied or have been waived.

## FACTUAL ALLEGATIONS

12.     On March 8, 2020, at approximately 9:00 p.m., Defendant Morris was dispatched to 2402 NW 6th Court, Fort Lauderdale, Florida in response to a sexual battery call just taking place and as a result a "Be On the Look Out" ("BOLO") was issued.

13.     Defendant Morris, along with other FLPD officers and Broward County Sheriff's Office ("BSO") Sheriffs, arrived at the scene and began searching for individuals who fit the BOLO description: an unarmed, thirty – five (35) year-old Black male, wearing a black shirt, black pants, dreadlocks, with a black bicycle.

14.     As the Officers and Sheriffs surrounded the area, Mr. Gedeus, was in the area leisurely riding his bicycle on his way home.

15.     As Mr. Gedeus reached the intersection of NW 6th Place and NW 24th Avenue to make a right turn toward his house, almost simultaneously, Defendant Morris was making a left at the same intersection, thereby striking Mr. Gedeus with his patrol vehicle.

16.     The impact of the vehicle striking Mr. Gedeus and his bicycle shattered a portion of the windshield of the police cruiser driven by Defendant, Morris.

17.     Mr. Gedeus, in mortal fear of police officers and concerned about the aggressive posturing of Defendant Morris,  got up and in mortal fear rapidly moved away with his bicycle in hand. However, as Mr. Gedeus reached the back of Defendant Morris' patrol vehicle, near the trunk of his car, Defendant Morris ordered Mr. Gedeus to turn around and walk towards Defendant Morris.

18.     According to video surveillance, Defendant Morris violently grabbed Mr. Gedeus' bicycle, Mr. Gedeus, confused and afraid, dropped his bicycle and ran east on NW 6th Place, toward other FLPD Officers and BSO Sheriffs.

19.     According to video surveillance, Defendant Morris stumbled over Mr. Gedeus' bicycle, however, once Defendant Morris regained balance, he immediately chased after Mr. Gedeus.

20.     Upon information and belief, an FLPD Officer was driving west on NW 6th Place at the same time Mr. Gedeus ran east on NW 6th Place.

21.     Despite having a visual of the FLPD Officer's patrol vehicle as the FLPD Officer turned on his emergency lights, Defendant Morris discharged his firearm on Mr. Gedeus, who was unarmed.

22.     Mr. Gedeus died after sustaining at least ten (10) bullet wounds to his body; three (3) of which were located in his back.

23.     Onlookers expressed serious concern regarding the necessity to shoot an unarmed person so many times when in the area a large amount of police presence was apparent.

24.     Defendant Morris has been employed by the City since March 22, 2006, and has a known history of unlawful use of force. The City Police Department and City officials knew that:

a.  On January 13, 2008, Officer Morris conducted a traffic stop after observing the subject vehicle driving erratically. Upon the vehicle coming to a complete stop in the front yard of a residence, the driver and passenger exited the vehicle. Before fleeing, the passenger grabbed something from under the car seat and the driver also grabbed something from under his car seat. Officer Morris ordered them to get on the ground, however, both individuals failed to comply. Officer Morris exited his vehicle, drew his weapon, and stayed behind his vehicle using it for cover. The passenger fled the scene towards the backyard of the residence and the driver slowly started to walk away from Officer Morris heading in the same direction as the fleeing passenger. Officer Morris commanded the driver to get on the ground and to show his hands. As the driver turned towards Officer Morris, Officer Morris saw what he believed to be a firearm in the driver's hand and in response Officer Morris fired his firearm four times, killing the driver. Once Officer Morris approached the driver, he realized that the driver did not have a firearm. Officer Morris was not disciplined. It is important to note that Officer Morris was back on duty days after this incident

b.  On July 6, 2008, in connection with a misdemeanor arrest for possession of drug paraphernalia, Officer Morris and another officer attempted to retrieve drugs from the suspect's mouth, the suspect attempted to swallow the evidence. Officer Morris applied a pressure point under the suspect's chin to prevent him from swallowing, but the suspect continued to resist. Both officers took the suspect to the ground at which time Officer Morris struck the suspect with his knee. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

c.  On October 14, 2008, Officer Morris conducted a traffic stop where the driver attempted to flee on foot. Officer Morris attempted to handcuff the suspect who refused to comply. Officer Morris took the suspect to the ground. Once on the ground, he was able to gain control by placing a knee on the suspect's back. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

d.  On December 17, 2008, after a FLPD officer initiated a traffic stop, the officer detained and observed the suspect to be concealing what was believed to be crack cocaine in his mouth. Officer Morris arrived and assisted in removing the drugs from the suspect's mouth. When the suspect refused, Officer Morris delivered several open palmed distractions to the side of the suspect's face and jaw as well as kicks to the shin area of the suspect. The suspect subsequently spit the suspected crack cocaine from his mouth. Again, Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

e.  On December 28, 2008, FLPD learned that Officer Morris illegally searched a citizen's vehicle after a Citizen Complaint was filed against Officer Morris. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures. It is important to note that Officer Morris' Internal Affairs file is completely devoid of the result of the City's investigation into the Citizen's complaint, despite Officer Morris violating a citizen's constitutional right.

f.  On February 24, 2009, Officer Morris responded to a call for assistance from another officer who was in pursuit of a fleeing suspect. Officer Morris pursued the suspect on foot and grabbed the suspect's arm. The suspect refused to comply and attempted to punch Officer Morris. The suspect broke free and attempted to flee. Officer Morris performed a brachial stun to the suspect's neck and performed four knee spikes to the suspect's abdomen. Officer Morris leg swept the suspect to the ground and was taken into custody. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

g.  On September 27, 2009, Officer Morris conducted a traffic stop whereby he arrested the passenger in the backseat of the vehicle after the suspect refused to listen to Officer Morris' order to stop moving in the backseat. The suspect did not comply, so Officer Morris pulled the suspect out of the backseat of the vehicle. After placing the suspect in custody, Officer Morris found a small baggie of cannabis in the suspect's left hand. Officer Morris transported the suspect to BSO jail, at which time he advised the suspect that he needed to search him before taking him into the jail. As Officer Morris conducted his pat down search of the suspect, the suspect turned towards Officer Morris where he utilized a leg sweep, which brought the suspect to the ground. Officer Morris proceeded to wrap his right arm around the suspect's head. At that time, BSO jail personnel intervened and were able to take the suspect into the BSO jail. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

h.  On February 9, 2010, Officer Morris observed a vehicle driving without its headlights on. Officer Morris conducted a traffic stop. The driver exited the vehicle and began walking away. Officer Morris ordered the driver to stop, which the driver complied with such order. The driver advised Officer Morris his license was suspended. At which time, Officer Morris requested back up. Officer Morris observed the passenger reaching under his shirt in an attempt to conceal something from Officer Morris. When Officer Morris attempted to conduct a pat down search

of the passenger, the passenger pushed Officer Morris away and attempted to reach for his waistband. "A violent struggle ensued." Eventually, Officer Morris was able to place the passenger into custody. However, Officer Morris' Internal Affairs file is completely devoid from any use of force report and/or incident that occurred on February 9, 2010. The FLPD Internal Affairs Department failed to investigate such arrest despite being aware that Officer Morris used force during this encounter.

i. On February 26, 2010, Officer Morris conducted a traffic stop when the driver stopped and fled on foot. After Officer Morris located the suspect, who was hiding behind a shed, Officer Morris attempted to pull the suspect from behind the shed to enable handcuffing him. The suspect tensed up and Officer Morris placed his knee on the suspect's back in order to place handcuffs on the suspect. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

j. On March 23, 2010, Officer Morris observed a citizen smoking marijuana inside a parked vehicle. Officer Morris informed the citizen he was under arrest and attempted to handcuff the citizen while he sat in the vehicle. After placing one handcuff on the citizen, the citizen resisted. Officer Morris pulled the citizen out of the vehicle and took him to the ground. Officer Morris kicked the citizen twice to gain compliance. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

k. On July 8, 2010, FLPD learned that Officer Morris was involved in a citizen arrest whereby the citizen wished to file a Citizen Complaint against him after being arrested on June 20, 2010, by Officer Morris. Although Officer Morris' Internal Affairs file has a note regarding a citizen wishing to file a complaint against him, his file is completely devoid from any incident involving any use of force that occurred on June 20, 2010, with this specific citizen. In fact, the notes specifically states that the citizen was arrested for, among other things, resisting arrest with violence and battery on a law enforcement officer. The FLPD Internal Affairs Department failed to investigate such arrest despite being aware that the citizen was charged with resisting with violence and battery on a law enforcement officer and Officer Morris failed to report such use of force. However, FLPD accepted Officer Morris' version of the facts at face value even after finding out that Officer Morris indeed used force during the arrest on June 20, 2010.

l. On May 24, 2011, FLPD learned that Officer Morris used excessive force during a citizen's arrest on May 23, 2011. However, Officer Morris' Internal Affairs file is completely devoid from any incident that occurred on May 23, 2011. FLPD only placed a note in Officer Morris' file and the Internal Affairs Department failed to follow up and/or investigate such claims that Officer Morris failed to notate during his arrest of the citizen. FLPD, again, accepted Officer Morris' version of the facts at face value despite a citizen complaint being filed against him for excessive use of force.

m.  On April 4, 2013, Officer Morris unnecessarily deployed his K-9 on a handcuffed citizen, which was witnessed by Broward Sheriff's Office Detective Jeffrey Kogan. Following Jeffrey Kogan's report to the Broward State Attorney's Office regarding Officer Morris' unlawful conduct, Jeffrey Kogan was ostracized and demoted to road patrol for reporting what he saw, for which he filed a whistleblower lawsuit.

n.  On January 25, 2014, Officer Morris responded to a call for assistance from another officer who was in pursuit of a fleeing suspect. During the K-9 search conducted by Officer Morris, the officers discovered the suspect hiding in an exterior closet of a house. The other officer attempted to restrain the suspect, but a struggle ensued. The other officer struck the suspect with the heel of his palms to gain compliance. After the other officer gained compliance, Officer Morris deployed his K-9. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

o.  On March 28, 2016, Officer Morris responded to a call for assistance from another FLPD officer, Officer Requejo, who heard over the police radio that a vehicle pursuit had been initiated involving a stolen vehicle whereby the suspects in the vehicle fled on foot. The suspects were seen entering an apartment complex. A perimeter was established by other officers. Officer Requejo entered the apartment complex with Officer Morris walking behind him. Both officers proceeded to the second-floor level where they were obstructed from passing by as they encountered a resident who stood on the balcony of which they needed to walk through. The officers ordered the resident to move, however he refused to comply. As such, Officer Morris advised the resident he was under arrest and attempted to place him in custody. The resident refused to be taken into custody and physically resisted Officer Morris' efforts. Officer Morris forced the resident to the ground and physically struggled to place handcuffs on him. Officer Morris was able to secure the resident and remove him from the scene. However, Officer Morris' Internal Affairs file is completely devoid from any use of force report and/or incident that occurred on March 28, 2016, despite a supplemental report specifically detailing the use of force Officer Morris engaged in. Officer Morris was not disciplined nor was a determination made as to whether he violated City policies and procedures.

p.  On August 8, 2018, Officer Morris responded to a call for assistance from another officer who responded to a disturbance. The suspect was agitated and behaving erratically. Prior to Officer Morris' arrival, seven officers were already at the scene assisting in placing the suspect into custody. Upon Officer Morris' arrival, the suspect was already in a hobble restraint with his stomach on the ground. However, Officer Morris deployed his subject control spray on the suspect, used a shoulder pin to force the suspect to remain on the ground and subsequently kicked the suspect in the face and used his foot on the suspect's shoulder to keep him on the ground. Officer Morris' was not disciplined nor was a determination made as to whether he violated City policies and procedures. The City also failed to review any Body Worn Camera footage from the officers present at the scene.

    q.   On May 22, 2019, Officer Morris responded to a call for assistance from another officer who was conducting a traffic stop on a reported stolen vehicle. The driver of the vehicle fled the scene. The driver, "Citizen Thomas," was located by K9 Sergeant Cristafaro, who was hiding under a pickup truck. Due to Citizen Thomas being a suspected fleeing felon, Sergeant Cristafaro deployed his K9, "Benko." Benko made contact with Citizen Thomas, biting his left leg. Officer Morris and Officer Sheehan assisted Sergeant Cristafaro with taking Citizen Thomas into custody. Officer Sheehan pointed his duty handgun toward Citizen Thomas and Officer Morris attempted to place him in handcuffs. However, Officer Morris "utilized a distraction technique by kicking Citizen Thomas in his torso area." After Citizen Thomas was placed into custody, he was transported to the hospital for several different injuries, including a possible collapsed lung. Although the City Police Department deemed the force used by other officers on scene, specifically Sergeant Cristafaro and his K9 partner, to be in accordance with City policy, Officer Morris' use of force was not investigated nor was his BWC reviewed, despite his clear use of excessive force on Citizen Thomas who was on the ground being bitten by Sergeant Cristafaro's K9, Benko.

25.    Additionally, Defendant Morris failed to activate his Body Worn Camera ("BWC"), during the subject incident, in direct violation of FLPD's Standard Operating Procedures ("SOP") on body worn camera usage, Policy 315, which requires that all sworn staff members below the rank of Lieutenant use BWC while engaged in field activities and all sworn staff, regardless of rank shall utilize BWCs while working off-duty details.

26.    Since the inception of FLPD's policy on BWC in 2018, FLPD is in possession of only two (2) footages between January 2019 and March 2020, where Defendant Morris activated his BWC during an incident where he reported he used force.

27.    However, Defendant Morris has six (6) documented use of force reports during the above timeframe, despite FLPD's BWC policy which requires all police officers to use their BWC while engaged in field activities.

28.    Due to FLPD's failure to review Defendant Morris' BWC footage in connection with his use of force reports, Defendant Morris' conduct has gone unchecked.

29.     FLPD accepts the version of facts stated by Defendant Morris at face value, which he is very well-aware of since he has never been reprimanded for failing to use his BWC during incidents where he reported he used force.

30.     FLPD's failure to review Defendant Morris' BWC in connection to his use of force report has allowed Defendant Morris to go unchecked.

31.     Defendant Morris has never been punished for his use of force because Defendant City's custom and practice of not independently reviewing alleged circumstances asserted to be the basis for using force.

32.     There is not a single note or reprimand in Defendant Morris' file regarding his failure to use his BWC as required by FLPD's policy, thereby encouraging the unlawful police use of force and tacitly authorizing deliberate indifference toward police misconduct.

33.     One purpose of the review policy is to monitor police officers' use of force against civilians.

34.     The review policy exists because the City of Fort Lauderdale is fully aware of the need for oversight based on known instances of police excessive use of force against innocent civilians.

35.     If police officers are not supervised and their use of force subject to administrative review, the officers will use force indiscriminately.

36.     Additionally, in 2013, Defendant Morris was placed on a Brady list after being investigated for allegations of excessive use of force.

37.     While employed with Defendant City, Defendant Morris has had approximately 101 Use of Force Reports filed – approximately seventy-seven percent (77%) of whom were

African American – and thirty-three (33) Citizen Complaints filed against him – approximately eighty-five percent (85%) of whom were African American.

38.     Based on the above listed incidents, the number of use of force reports is higher since Officer Morris failed on multiple occasions to report his use of force during a citizen encounter, of which the City was aware of.

39.     A number of incidents listed above and in the extensive Internal Affairs ("IA") report of Defendant Morris involves Defendant Morris deploying his police dog ("K-9"), "Grief", on fleeing suspects, most of whom were unarmed. The report also notes the 2013 incident in which the Broward State Attorney's Office investigated allegations that Defendant Morris unnecessarily deployed his K-9 on a handcuffed suspect. Jeffrey Kogan, the then-detective who reported that incident, was ostracized and demoted to road patrol for reporting what he saw, for which he filed a whistleblower suit.[1]

40.     By custom and practice, Defendant City has a history of deploying K9s on individuals who are unarmed, accused of a nonviolent crime, and African American.

41.     Specifically, the South Florida Sun-Sentinel uncovered that ninety percent (90%) of people bitten by K9s were African American.[2]

42.     By custom and practice, Defendant City does not follow its use of force investigation protocols.

---

[1] (Dan Christensen, Broward Prosecutors vilify BSO detective who alleged misconduct; 'Bloody…not improper', https://www.floridabulldog.org/2014/04/broward-prosecutors-vilify-bso-detective-who-alleged-misconduct-bloody-not-improper/) (last visited October 18, 2021).

[2] (Brittany Wallman, Mario Ariza, Megan O'Matz, Police K-9s are meant to stop dangerous felons. They're more often unleashed on Black people accused of stealing, http://www.sun-sentinel.com/local/broward/fl-ne-police-unleash-k9s-on-black-men-20210609-72eykhou3beedige2kr6nsedbi-htmlstory.html) (last visited October 18, 2021).

43.     By custom and practice, Defendant City is aware that a pattern of constitutional violations exists by way of use of excessive force, and nevertheless, fails to provide adequate training, thereby being deliberately indifferent to the constitutional violations.

44.     Every Fort Lauderdale police officer who uses force during a citizen encounter is required to disclose the use of force for agency review. The disclosure is typically made in the arrest affidavit or offense incident report.

45.     The use of force report discloses the force used as well as the officer's justification for using that force, including the circumstances that necessitated the force.

46.     By custom and practice, Defendant City does not investigate the truth of the matters asserted by its officers in their use of force disclosures.

47.     Agency reviewers do not look to evidence independent of what the officers self-report, even if the evidence is in the form of undisputable body camera footage. Stated differently, the Defendant City accepts the version of the facts stated by the police at face value, even when it knows or has reason to believe the statements are false, manufactured, or materially exaggerated.[3]

48.     The failure by Defendant City to conduct independent investigations allows aggressive members of the City police force who use excessive force to act unchecked, thus rendering the agency review process and BWC policy meaningless, resulting in endangered civilians.

---

[3] (Rafael Olmeda and Andrew Boryga, Fort Lauderdale's bodycam policy violated basic police practices, experts say, http://www.sun-sentinel.com/local/broward/fort-lauderdale/fl-ne-lauderdale-officer-investigation-folo-20200626-cpkcphohjbbdvbnwgabottugnm-story.html) (last visited October 18, 2021).

49.     This lack of accountability encourages the unlawful use of excessive force by police officers at FLPD.

50.     In fact, the City stripped away the powers of the Citizen Police Review Board. The City's Citizen Police Review Board was put in place in 1994 to assure that complaints of police misconduct were thoroughly, objectively investigated and resolved. In 2006, the City issued an opinion narrowing the board's scope by limiting it to complaints filed by the public and not to investigations started internally, which can arise from shootings, police chases, car accidents, or other matters.

51.     Additionally, the Citizen Police Review Board only meets when the internal affairs investigation is completed, and the board must rely on internal affairs to receive complaints. In recent years, the board has sparingly met and reviewed a small number of cases for a police department that is riddled with corruption.

52.     The City's failure to independently review Defendant Morris' assertions that the force he used during encounters was justified allowed his behavior to go unchecked and resulted in countless innocent victims of his excessive force, including the use of deadly force against Mr. Gedeus.

53.     The investigative department at FLPD simply took Defendant Morris' words at face value despite the frequency and large amount of citizen complaints regarding Defendant Morris' conduct with citizens in the community he regularly patrolled.

54.     Officer Morris' prior acts should have alerted the City that he was probative to commit constitutional violations; especially, constitutional violations related to the use of excessive force.

13

55.     The *South Florida Sun-Sentinel* uncovered evidence that independent body camera footage of several of FLPD Officers found that Officer Steven Pohorence's ("Officer Pohorence") citizen encounters debunked his asserted claims of his justified use of force.[4]

56.     Officer Pohorence, who coincidentally, arrived at the scene of the subject incident merely nine (9) seconds after Defendant Morris and has a known history of unlawful use of force, was never punished for his use of force in those aforementioned incidents because of the Defendant City's custom and practice of not independently reviewing the alleged circumstances asserted to be the basis for using force.

57.     Defendant Morris' prior uses of excessive force against other citizens and disparate treatment of citizens placed Defendant City on notice of his propensity to violate the constitutional rights of citizens.

58.     By custom and practice, Defendant City allowed its officers to forgo the use of FLPD issued BWC without reprimand.

59.     This lack of accountability encourages the unlawful police use of force as the City's *de facto* policies, practices, and/or customs, individually and/or collectively, were the moving force behind Defendant Morris' described conduct, depriving Plaintiff of his constitutional right.

60.     Upon information and belief, FLPD failed to adequately train Defendant Morris in how to properly apprehend an individual without the use of deadly force when the individual is not posing a risk of great bodily harm to the Officer or the community at large, and who is unarmed.

---

[4] (Rafael Olmeda and Brooke Baitinger, Videos Show Fort Lauderdale cop pushing his knee into men's necks for arrests, https://www.sun-sentinel.com/local/broward/fort-lauderdale/fl-ne-fort-lauderdale-cop-new-investigation-20200623-6dcvk46ztff6ra3jek6nkkwyfi-story.html) (last visited October 18, 2021).

<u>**COUNT I**</u>
<u>**EXCESSIVE FORCE IN VIOLATION OF FOURTH AMENDMENT – DUE PROCESS**</u>
<u>**(42 U.S.C § 1983) AS TO DEFENDANT, MORRIS**</u>

61.    Plaintiff hereby incorporates paragraphs 1-60 as though fully set forth herein.

62.    This is an action brought against Defendant MORRIS pursuant to the United States

Constitution Amendments IV and XIV in violation of 42 U.S.C. § 1983 and §1988.

63.    42 U.S.C. § 1983, in pertinent part, provides that:

> Every person, who under color of any statute, ordinance, regulation,
> custom or usage of any state or territory or the District of Columbia
> subjects or causes to be subjected any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges or immunities secured by the constitution and law
> shall be liable to the party injured in an action at law, suit in equity,
> or other appropriate proceeding for redress …

64.    The actions of Defendant MORRIS described above, in initially unjustifiably

chasing after Decedent BARRY GEDEUS, and thereafter, discharging his firearm at least ten (10)

times with (3) bullets to Decedent BARRY GEDEUS' back, was excessive and shocks the

conscience.

65.    In committing the acts complained of herein, Defendant MORRIS acted under color

of state law to deprive Decedent BARRY GEDEUS of his clearly established constitutionally

protected rights and amount to clear violation of 42 U.S.C. § 1983:

- The right and privilege not to be deprived of his life and liberty without due
  process and equal protection of the laws;

- The right and privilege to be free from unjustifiable attack upon the physical
  integrity of his person; and

- The right and privilege to be free from physical abuse, coercion, and
  intimidation.

15

66.     The actions of Defendant MORRIS resulted directly and proximately in the deprivation of the aforementioned constitutionally protected rights afforded to Decedent BARRY GEDEUS.

67.     In violating Decedent BARRY GEDEUS' rights as set forth above and other rights that will be proven at trial, Defendant MORRIS acted under color of state law and utilized unnecessary, unjustified, unreasonable, and excessive force.

68.     From the actions of Defendant MORRIS, it can be inferred that Defendant MORRIS acted with the intent to harm Decedent BARRY GEDEUS.

69.     The actions of Defendant MORRIS were not related to any legitimate objective of arrest.

70.     The actions of Defendant MORRIS were not related to any justifiable government interest.

71.     In addition, the actions of Defendant MORRIS constituted an abuse of the power he holds by virtue of his position as a CITY of Fort Lauderdale police officer.

72.     Plaintiff, Tony Syffrad, as Personal Representative of the Estate of BARRY GEDEUS, claims damages on behalf of the Estate of BARRY GEDEUS for the value of decedent's life, including but not limited to the following:

- Loss of past and future support and services with interest;

- Loss of earnings and net accumulations to the Estate of Barry Gedeus;

- Any and all medical and/or funeral expenses incurred due to the wrongful death of the Decedent;

- Loss to decedent's survivors of companionship with decedent, and the mental pain and suffering from the past date of injury through the future, as a result of Barry Gedeus' death;

- Award reasonable attorneys' fees and costs to Plaintiff on Federal 42 U.S.C. § 1983 Count pursuant to 42 U.S.C. § 1988;

- Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff Tony Syffrad, as Personal Representative of the Estate of BARRY GEDEUS, deceased, demands judgment against the Defendant, CITY; attorney's fees pursuant to 42 U.S.C. § 1988 and a trial by jury on all triable issues and such further relief that this Court deems just and proper.

### COUNT II
### BATTERY AS TO DEFENDANT, MORRIS

73.     Plaintiff hereby incorporates paragraphs 1-60 as though fully set forth herein.

74.     This is an action brought against Defendant MORRIS for battery pursuant to the laws of the state of Florida.

75.     Defendant MORRIS committed acts intended to cause Decedent BARRY GEDEUS an apprehension of harmful or offensive contact.

76.     The force used by Defendant MORRIS was a harmful and offensive contact.

77.     Decedent BARRY GEDEUS suffered a harmful and offensive contact when he was shot and killed by Defendant MORRIS.

78.     At all times material hereto, Defendant MORRIS was an employee and/or agent of Defendant CITY, and acting within the course and scope of his employment with same, in furtherance of the interest of Defendant CITY and with Defendant CITY's consent.

79.     Defendant MORRIS acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

80.     As a direct and proximate result of Defendant MORRIS's battery, Decedent BARRY GEDEUS suffered ongoing and permanent damages; namely death.

81.     Plaintiff, Tony Syffrad, as Personal Representative of the Estate of BARRY GEDEUS, claims damages on behalf of the Estate of BARRY GEDEUS as provided by the Florida Wrongful Death Act for the value of decedent's life, including but not limited to the following:

- Adelin S. Syffrard Gedeus, as mother of Barry Gedeus, and Samuel Gedeus, as father of Barry Gedeus, have sustained the following damages:

  i.   Loss of past and future support and services with interest;
  ii.  Mental pain and suffering from the date of injury, and

- The Estate of Barry Gedeus has sustained the following damages:

  i.   Loss of earnings and net accumulations to the Estate of Barry Gedeus;
  ii.  Funeral and burial expenses incurred as a result of the death of Barry Gedeus that have become a charge against his estate or that were paid on his behalf; and

- Each and every other Survivor has sustained the following damages:

  i.   Loss of support and services of their family member; and
  ii.  Mental pain and suffering from the date of injury and continuing for the remainder of their life.

- Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff Tony Syffrad, as Personal Representative of the Estate of BARRY GEDEUS, demands damages in an amount in excess of THIRTY THOUSAND DOLLARS ($30,000.00), together with post judgment interest and costs.

<u>COUNT III</u>
**<u>EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C § 1983) AS TO DEFENDANT, CITY OF FORT LAUDERDALE</u>**

82.     Plaintiff hereby incorporates paragraph 1-60 as though fully set forth herein.

83.     This is an action brought against Defendant CITY upon 42 U.S.C. § 1983. It authorizes redress for the deprivation of rights, privileges, and immunities caused by actions taken

18

under color of law. Said rights were secured to Decedent BARRY GEDEUS, by the Constitution and laws of the United States. This claim for relief is also based upon 42 U.S.C. § 1988. It authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

84.     Defendant Morris committed acts that violated Plaintiff's constitutional rights.

85.     Defendant Morris has never been disciplined for his unnecessary and excessive use of force.

86.     Prior to the Plaintiff's death described herein, Defendant Morris used excessive and unnecessary force against Fort Lauderdale civilians, as described above.

87.     The actions and inactions of Defendants City and Morris were done pursuant to one or more of the following *de facto* policies, practices, and/or customs of the City that are so pervasive as to carry the force of law.

88.     Defendant City has a *de facto* policy, practice, and/or custom of concealing and/or suppressing officer misconduct including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to accept and act on citizen complaints against police officers; failure to investigate criminal conduct involving officers; disparate treatment between an officer who is the subject of an investigation and a non-officer suspect; failure to promptly preserve evidence; failure to properly and sufficiently discipline an officer, even when a complaint is sustained; destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct is meritorious.

89.     Defendant City has a *de facto* policy, practice, and/or custom of deficient and biased procedures for investigating complaints of excessive force against on-duty officers.

90.     Defendant City has a *de facto* policy, practice, and/or custom of failing to maintain accurate and complete records of complaints and investigations of misconduct.

91.     Defendant City has a *de facto* policy, practice, and/or custom of failing to turn over and disclose complete records of complaints and investigations of misconduct.

92.     Defendant City has a *de facto* policy, practice, and/or custom of a "code of silence" (also referred to as the "blue shield"). This code is an implicit understanding between and among members of the City Police Department resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their obligation to do so as sworn police officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations against a fellow officer related to misconduct to protect themselves or their fellow officers from discipline, criminal prosecution, or civil liability.

93.     Defendant City has knowledge of the constitutional violations of the Northwest Raiders ("NW Raiders") and its members. The City's police department created the NW Raiders in 1983 during the height of a crack cocaine era where the community was immersed with violence and illegal drug activity. Citizens have lodged a myriad of complaints against the NW Raiders including but not limited to, abuse, police brutality, illegal searches, and fabrication of allegations leading to an individual's arrest. Members of the community and local organizations have complained of the NW Raiders' illegal conduct, but few complaints have been sustained.

94.     Defendant City stripped away the powers of the Citizen Police Review Board. The City's Citizen Police Review Board was put in place to assure that complaints of police

20

misconduct were thoroughly, objectively investigated and resolved. However, in 2006, the City issued an opinion narrowing the board's scope by limiting it to complaints filed by the public and not to investigations started internally, which can arise from shootings, police chases, car accidents, or other matters.

95.     Defendant City acted in a manner consistent with a *de facto* policy, practice, and/or custom of a "code of silence" and "blue shield" when it failed to investigate the truth of the matters asserted by its officers in their use of force disclosures.

96.     Defendant City acted in a manner consistent with a *de facto* policy, practice, and/or custom of a "code of silence" and "blue shield" when it chose not to discipline or investigate Officer Morris for the constitutional violations committed against Plaintiff and others.

97.     Defendant City acted in a manner consistent with a *de facto* policy, practice, and/or custom of a "code of silence" or "blue shield" when it engaged in conduct such as, but not limited to, the following:

- The City Internal Affairs ("IA"), and Police Department supervisors and superiors failed to conduct proper administrative investigations into Defendant Morris before and after Plaintiff's death.

- The City failed to properly investigate and/or discipline Defendant Morris before and after the Plaintiff's death.

- The City and its Police Department's policies and practices governing behavioral intervention are deficient in that they are non-disciplinary.

98.     The City and its Police Department supervisors and superiors knew its officers, including Defendant Morris, were using excessive force against Fort Lauderdale civilians and

residents. It took no actions to train or discipline its police officers to avoid the constitutional violations discussed above.

99.     Individually and collectively, the above-described *de facto* policies, practices, and/or customs of the City proximately result in the culture and pervasive attitude among members of the FLPD, including Defendant Morris, that they may engage in misconduct against citizens, residents, others with impunity, and without fear of official consequence. The City's police officers, including Defendant Morris consider themselves "above the law."

100.    The aforementioned *de facto* policies, practices, and/or customs of the City, individually and collectively, have been maintained and/or implemented with utter indifference by the City and has or have encouraged and/or motivated Defendant Morris to engage in the described conduct and wrongful acts against the Plaintiff, and therefore acted as the direct and proximate cause of the injuries sustained by the Plaintiff.

101.    The aforementioned *de facto* policies, practices, and/or customs of the City, individually and/or collectively, were the moving force behind Defendant Morris' described conduct, depriving Plaintiff of his constitutional rights.

102.    The above acts and/or omissions of the City violated Plaintiff's rights under the Fourth Amendment to the United States Constitution.

103.    As a direct and proximate result of the City's conduct, Plaintiff suffered serious and severe bodily injury, which resulted in his death.

104.    As a direct and proximate result of the tragic and untimely death of Decedent BARRY GEDEUS, the Estate of Barry Gedeus has in the past and will in the future, suffer damage including medical and funeral expenses due to decedent's death.

105.     Plaintiff Tony Syffrad, as Personal Representative of the Estate of Barry Gedeus, claims damages on behalf of the Estate of Barry Gedeus for the value of decedent's life, including but not limited to the following:

- Adelin S. Syffrard Gedeus, as mother of Barry Gedeus, and Samuel Gedeus, as father of Barry Gedeus, have sustained the following damages:

    i.   Loss of past and future support and services with interest;
    ii.  Mental pain and suffering from the date of injury, and

- The Estate of Barry Gedeus has sustained the following damages:

    i.   Loss of earnings and net accumulations to the Estate of Barry Gedeus;
    ii.  Funeral and burial expenses incurred as a result of the death of Barry Gedeus that have become a charge against his estate or that were paid on his behalf; and

- Each and every other Survivor has sustained the following damages:

    i.   Loss of support and services of their family member; and
    ii.  Mental pain and suffering from the date of injury and continuing for the remainder of their life.
- Any and all other and further relief as this Court may deem appropriate.

WHEREFORE, Plaintiff Tony Syffrad, as Personal Representative of the Estate of BARRY GEDEUS, deceased, demands judgment against the Defendant, CITY; attorney's fees pursuant to 42 U.S.C. § 1988 and a trial by jury on all triable issues and such further relief that this Court deems just and proper.

## <u>COUNT IV</u>
## <u>NEGLIGENT TRAINING AS TO DEFENDANT, CITY OF FORT LAUDERDALE</u>

106.     Plaintiff hereby incorporates paragraphs 1-60 as though fully set forth herein.

107.     At all times material hereto, Defendant City owed a duty to take reasonable care in the instruction and training of its employees.

108.     Defendant City breached its duty by failing to provide adequate training and by failing to adhere by its agency review procedures, including by:

- Maintaining a custom of ignoring and/or covering up known or suspected misconduct by its officers, including excessive and unreasonable uses of force;

- Maintaining a plan and practice of using Fort Lauderdale Police Department resources to protect its employees from criminal, civil, and administrative consequences of their excessive use of force and to protect the City from embarrassment and accountability;

- Maintaining a plan and practice of controlling persons and use of force reporting, allowing 1) incomplete statement-taking, 2) incomplete disingenuous analysis of the force used, 3) understatements of the force used, and 4) overstatement of the resistance to which the use of force allegedly in response;

- Failing to meaningfully train and/or discipline officers with respect to the appropriate use of force during police-citizen encounters and the proper reporting of incidents that involved the use of force, even after learning of a steady increase in the number of sustained excessive force allegations against FLPD employees, as required by City policies and procedures;

- Failing to properly investigate suspected incidents of excessive force in line with its review policies.

109.     Defendant City was aware of a pattern that its officers, including Officer Morris, failed to activate their BWC to ensure the absence of video evidence during encounters with citizens during field activities as one of the purposes of the review of BWCs policy is to monitor police officers' use of force against civilians.

24

110.    Defendant City's failure to provide adequate training in the proper use and activation of BWC despite its purpose to monitor police officers, such failure is considered to be deliberately indifferent.

111.    Defendant City was placed on notice of prior issues concerning Officer Morris' use of excessive force against citizens, as detailed above.

112.    Defendant City knew of Officer Morris' continued failure to activate his BWC and the City made a deliberate choice not to take any action.

113.    Defendant City's failure to provide adequate training to its police officers relative to the amount of force needed to apprehend an unarmed civilian, like in the case against Fort Lauderdale Police Officer Steven Pohorence who placed his knee directly over the neck of a citizen. In fact, the same officer was also found to have slammed his knee over another citizen's neck. However, Officer Steven Pohorence and Officer Morris are not the only Fort Lauderdale police officers who fail to have the adequate training relative to the amount of force needed to apprehend an unarmed civilian. The City is aware of other officers who have engaged in excessive force as a result of the inadequate training provided. With such notice, the City has shown deliberate indifference to the violation of the constitutional rights of its citizens.

114.    Notwithstanding the foregoing, as stated by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), Defendant City knows "to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."

115.    Officer Morris' continued violation of constitutional rights of citizens, including the use of deadly force against Mr. Gedeus, who was unarmed, was so apparent that the need for further training must have been plainly obvious to Defendant City, but nevertheless, was deliberately indifferent to the need.

116.    As a direct and proximate result of the City's negligent training of Defendant Morris, resulting in the death of Decedent BARRY GEDEUS, Samuel Gedeus and Adelina Siffrat, parents of Decedent BARRY GEDEUS, and beneficiaries of the Estate of Barry Gedeus have in the past suffered and will, in the future, suffer damages including medical and funeral expenses, due to the decedent's death.

117.    Plaintiff Tony Syffrad, as Personal Representative of the Estate of Barry Gedeus, claims damages on behalf of the Estate of Barry Gedeus, as provided by the Florida Wrongful Death Act, for the value of decedent's life, including but not limited to, the following:

- Adelin S. Syffrard Gedeus, as mother of Barry Gedeus, and Samuel Gedeus, as father of Barry Gedeus, have sustained the following damages:

    i.  Loss of past and future support and services with interest;
    ii. Mental pain and suffering from the date of injury, and

- The Estate of Barry Gedeus has sustained the following damages:

    i.  Loss of earnings and net accumulations to the Estate of Barry Gedeus;
    ii. Funeral and burial expenses incurred as a result of the death of Barry Gedeus that have become a charge against his estate or that were paid on his behalf; and

- Each and every other Survivor has sustained the following damages:

    i.  Loss of support and services of their family member; and
    ii. Mental pain and suffering from the date of injury and continuing for the remainder of their life.

- Any and all other and further relief as this Court may deem appropriate.

26

WHEREFORE, Plaintiff Tony Syffrad, as Personal Representative of the Estate of Barry Gedeus, demands damages in an amount in excess of THIRTY THOUSAND DOLLARS ($30,000.00), together with post judgment interest and costs.

**COUNT V**
**BATTERY AS TO DEFENDANT, CITY OF FORT LAUDERDALE**

118.     Plaintiff hereby incorporates paragraphs 1-60 as though fully set forth herein.

119.     Defendant MORRIS committed acts intended to cause Decedent BARRY GEDEUS an apprehension of harmful or offensive contact.

120.     The force used by defendant MORRIS was harmful and offensive contact.

121.     Defendant MORRIS was acting in the scope of his employment.

122.     Defendant MORRIS acted intentionally but not in bad faith or malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

123.     Pursuant to Florida Statute 768.28(9), the CITY is vicariously liable.

124.     As a direct and proximate result of Defendant MORRIS's battery, Decedent BARRY GEDEUS suffered damages that ultimately resulted in his death.

125.     At all times material hereto, Defendant CITY, its agents, servants and/or employees, intentionally caused bodily harm/offensive contact to Decedent BARRY GEDEUS by using deadly force against his person, by shooting and killing him.

126.     At all times material hereto, Decedent BARRY GEDEUS did not consent to such bodily harm/offensive contact.

WHEREFORE, Plaintiff TONY SYFFRAD, as Personal Representative of the Estate of BARRY GEDEUS, demands all damages against Defendant MORRIS and Defendant CITY permissible under Florida Statutes § 768.21 known as the "Florida Wrongful Death Act," for injuries suffered by the decedent BARRY GEDEUS as a result of the defendants' tort, including

but not limited to loss of support and future loss of support, past and future loss of services, past and future loss of earnings, medical and funeral expenses and for such other relief that this Court may deem appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following damages against Defendants, as provided by the Florida Wrongful Death Act and the Unites States Constitution, including but not limited to the following:

    a.  Award compensatory damages to Plaintiff;

    b.  Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983 Counts pursuant to 42 U.S.C. §1988;

    c.  Adelin S. Syffrard Gedeus, as mother of Barry Gedeus, and Samuel Gedeus, as father of Barry Gedeus, have sustained the following damages:

        i.  Loss of past and future support and services with interest;
        ii.  Mental pain and suffering from the date of injury, and

    d.  The Estate of Barry Gedeus has sustained the following damages:

        iii.  Loss of earnings and net accumulations to the Estate of Barry Gedeus;
        iv.  Funeral and burial expenses incurred as a result of the death of Barry Gedeus that have become a charge against his estate or that were paid on his behalf; and

    e.  Each and every other Survivor has sustained the following damages:

        v.  Loss of support and services of their family member; and
        vi.  Mental pain and suffering from the date of injury and continuing for the remainder of their life.

    f.  Any and all other and further relief as this Court may deem appropriate.

[SPACE INTENTIONALLY LEFT BLANK]

## <u>**TRIAL BY JURY**</u>

WHEREFORE, Plaintiff **TONY SYFFRAD**, as Personal Representative of the Estate of

**BARRY GEDEUS**, deceased, hereby demands a trial by jury on all issues so triable.

DATED this 30th day of June, 2022.


*Respectfully submitted,*

FRIEDLAND & ASSOCIATES, P.A.
Attorneys for Plaintiff
707 NE 3rd Avenue, Suite 201
Fort Lauderdale, Florida 33304
954 321-8810; 954 321-8995 (facsimile)
greeny@yourfightourbattle.com
pleadings@yourfightourbattle.com

By: */s/ Greeny Valbuena*_____
Lee Friedland, Esquire
FLA. BAR NO.: 991163
Greeny Valbuena, Esquire
FLA. BAR NO.: 1018239

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of June 2022, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail or by electronic mail to any non CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.


FRIEDLAND & ASSOCIATES, P.A.
Attorneys for Plaintiff
707 NE 3rd Avenue, Suite 201
Fort Lauderdale, Florida 33304
954 321-8810; 954 321-8995 (facsimile)
greeny@yourfightourbattle.com
pleadings@yourfightourbattle.com


By: /s/ *Greeny Valbuena*_____
Lee Friedland, Esquire
FLA. BAR NO.: 991163
Greeny Valbuena, Esquire
FLA. BAR NO.: 1018239